UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDRE C.T. WELLS, | ) |
|             Plaintiff, | ) |
| v. | )   No. 1:20-cv-01065-JMS-MPB |
| JACK HENDRIX, et al., | ) |
|             Defendants. | ) |

**Order Granting in Part and Denying in Part Motions for Summary Judgment**

Plaintiff Andre Wells alleges that he was transferred from Wabash Valley Correctional Facility to Pendleton Correctional Facility in retaliation for filing a civil rights lawsuit. He further alleges that, once at Pendleton, there was a delay in receiving his Bible that substantially burdened his ability to practice his religion. The defendants move for summary judgment. For the following reasons, the Medical Defendants' motion for summary judgment is **granted**, and the State Defendants' motion for summary judgment is **granted in part and denied in part**.

## I.     SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).

## II.     FACTUAL BACKGROUND

### A.  The Parties and Claims

Plaintiff Andre Wells is an inmate incarcerated by the Indiana Department of Correction ("IDOC"). At all relevant times to his complaint, he was housed at Wabash Valley Correctional Facility or Pendleton Correctional Facility.

Mr. Wells asserts First Amendment retaliation claims against the following defendants:

- Dr. Samuel Byrd, Medical Director at Wabash Valley and Mr. Wells' treating doctor, dkt. 69-4 at ¶¶ 2−3;
- Dr. Richard Mitcheff, Wexford's Regional Medical Director for Indiana; dkt 69-6 at ¶ 2;
- Kimberly Hobson, the Health Service Administrator at Wabash Valley, dkt. 69-5 at ¶ 4;
- Jack Hendrix, IDOC Classification Director;
- Wabash Valley Warden Richard Brown;
- Pendleton Warden Dushan Zatecky;
- IDOC Commissioner Robert Carter; and
- Wexford of Indiana, LLC, at all relevant times the medical care provider for IDOC.

Mr. Wells asserts First Amendment free-exercise claims against the following defendants:[1]

- Warden Zatecky;
- Mr. Alsip, Superintendent or Assistant Superintendent at Pendleton, Dkt. 71-2 at 76; and
- Mr. Reagle, Superintendent or Assistant Superintendent at Pendleton, *id.* at 77.

### B. Events Leading to Transfer from Wabash Valley to Pendleton

In 2016, Mr. Wells was housed at Wabash Valley when he fell and injured his lower back. Dkt. 69-1 at 1. His pain persisted, and in March 2018, he filed a lawsuit alleging that Corizon Health—then the medical provider for IDOC—and several nurses failed to render constitutionally adequate care to treat his back pain. *See Wells v. Corizon Health, Inc., et al.*, 2:18-cv-00124-JPH-DLP (hereinafter "the Corizon lawsuit").

On November 21, 2018, Dr. Samuel Byrd met with Mr. Wells to discuss treatment for his ongoing back pain. Dkt. 69-1 at 1. Dr. Byrd was not a defendant in the Corizon lawsuit but rather met with Mr. Wells to "re-establish [their] long term plan as it relates to his back pain." *Id.* Prescription medication and a self-guided physical therapy program (where inmates follow instructions on a handout) had been unsuccessful. *Id.* Dr. Byrd decided that the best next step was to transfer Mr. Wells to Miami Correctional Facility because Wabash Valley did not have an onsite physical therapist, and at Miami he would have improved access to care. *Id.*; dkt. 69-6 at ¶ 11. Mr. Wells told Dr. Byrd that he did not want to transfer because it took him two years to get a job at Wabash Valley and the transfer could cost him his job. Dkt. 69-1 at 2. He also stated that his back pain had gradually improved, and he would try to continue with the handout-based physical

---

[1] These defendants also discussed an access-to-court claim in their motion for summary judgment. However, Mr. Wells voluntarily dismissed the access-to-court claims before the defendants filed an answer. Dkts. 37, 38. The Court includes facts related to the delay in receiving legal papers as they relate to Mr. Wells' retaliation claim.

3

therapy. *Id.* Dr. Byrd told Mr. Wells that he would notify IDOC that he did not want to be transferred. *Id.*

Later that day, Dr. Byrd emailed several IDOC officials, including defendants Warden Brown and Mr. Hendrix, informing them that Mr. Wells did not want to be transferred because he did not want to lose his job. Dkt. 69-2 at 11. Mr. Hendrix wrote to Monica Gibson (an IDOC employee) and Dr. Michael Mitcheff, "This is the offender who was cleared yesterday for MCF. This is your call, just let us know your wishes and we will either proceed or cancel the move." *Id.* Dr. Mitcheff then advised Dr. Byrd to have Mr. Wells sign a refusal form stating he acknowledged he was refusing the recommended treatment plan, "[e]specially since he has filed suit with [physical therapy] being the issue." *Id.* at 10; dkt. 69-6 at ¶ 7. In the last email on November 21, Mr. Hendrix, responded, "If litigation is in play, I would suggest consulting with Mr. Bugher before finalizing this issue."[2] Dkt. 69-2 at 9.

Mr. Wells signed the refusal form on November 21 and wrote, "I would like to deny transfer at this time, and postpone rehab until litigation in my civil complaint is finalized. Thank you." Dkt. 69-1 at 11.

The email thread continued over the next few days. On November 22, Dr. Mitcheff wrote, "The legal issue is with Wexford." Dkt. 69-2 at 9. The next exchange occurred on November 26. Warden Brown wrote to Mr. Hendrix, "We received the Transport Authority to transfer Wells to ISR tomorrow. Should we proceed with the transfer or cancel?" *Id.* Mr. Hendrix responded, "We're good to go unless there are some concerns we are unaware of." *Id.* at 8. Warden Brown replied, "Ok, I just wanted to make sure since the offender was wanting to refuse his medical treatment

---

[2] The Court takes judicial notice that Mr. Bugher is an attorney for IDOC. *See* "Find a Person," IN.gov, https://www.in.gov/apps/iot/find-a-person/, (identifying Bob Bugher as Senior Attorney for the Indiana Department of Correction) (last accessed Dec. 27, 2021).

4

according to the emails below." *Id.* Dr. Byrd chimed in, "He signed a refusal for transfer last Wednesday. Thanks." *Id.* at 4. Warden Brown wrote to Mr. Hendrix, "Please see below from Dr. Byrd. I don't care if he goes or not but want to make sure everyone is in the loop since I found out that the offender has already signed a refusal." *Id.* Mr. Hendrix replied, "Yes, the offender is to transfer as approved." *Id.* Warden Brown then emailed Dr. Byrd, stating, "I just spoke to Jack Hendrix. Andre Wells is being transferred tomorrow regardless of the refusal he signed here. He doesn't know it so please make sure he is NOT made aware of the transfer. He will be advised once he is told he is being transferred." *Id.* at 8.

Mr. Wells was transferred to Pendleton on November 27.[3] Although he was transferred there so he could receive physical therapy, there was no treatment plan in place. Dkt. 71-2 at 50. Rather, he had to request it through a health care request form. *Id.* Nurse Practitioner Elaine Purdue submitted a request for onsite physical therapy to Dr. Mitcheff. Dkt. 69-6 at ¶ 10. Based on his familiarity with Mr. Wells' condition and collegial conversations with Dr. Byrd, Dr. Mitcheff approved Mr. Wells to receive at least four sessions of physical therapy at Pendleton. *Id.* Mr. Wells completed the physical therapy program at Pendleton, and he no longer suffers from lower back pain or takes medication to treat back pain. Dkt. 71-2 at 50−51.

Mr. Wells believes that Dr. Byrd, Dr. Mitcheff, Mr. Hendrix, Warden Brown, and Warden Zatecky conspired to transfer him in retaliation for filing the Corizon lawsuit and to "sabotage" the lawsuit. Dkt. 71-2 at 52−53, 66. He believes this based on the timing of the transfer because it occurred just days after he told Dr. Byrd he did not want to be transferred and sent a notice to Warden Brown asking not to be transferred. *Id.* at 53. He also argues that the fact that Pendleton staff never received a treatment plan for physical therapy indicates a retaliatory motive. *Id.* at

---

[3] It is not clear from the record why Mr. Wells was transferred to Pendleton rather than Miami Correctional Facility.

5

53−54. Finally, he observed a physical therapist provide physical therapy to inmates at Wabash Valley. Dkt. 78 at 5, ¶ 11. Another inmate, Lyndale Ivy, attested that he witnessed a physical therapist provide physical therapy to an inmate at Wabash Valley in 2015. *Id.* at 7, ¶ 4.

Mr. Wells alleges that IDOC Commissioner Carter and Wexford were responsible for the retaliation due to not training IDOC or Wexford employees to recognize and prevent retaliation. *Id.* at 33, 72, 75. He also alleges that IDOC and Wexford maintained a policy of transferring inmates after the inmates filed lawsuits. *Id.* at 73−74. Four inmates provided affidavits stating that they were "familiar" with Wexford and IDOC's policy of transferring inmates to another facility after the inmate filed a civil rights suit against them. Dkt. 78 at 8, ¶ 6 (Reaves Affidavit); 9, ¶ 4 (Cain Affidavit); 10, ¶ 3 (Q. Wells Affidavit); 11, ¶ 3 (McLaughlin Affidavit).

Although Mr. Wells alleged in his complaint that Health Service Administrator Kimberly Hobson retaliated against him, during his deposition he testified he was suing her because she refused to refer him to a doctor after he told her that the exercises she provided him were hurting rather than helping. Dkt. 71-2 at 26. He did not know if Ms. Hobson was aware of the Corizon lawsuit. *Id.* at 42.

Mr. Wells testified that he suffered several deprivations due to the transfer. *Id.* at 63. He blames the transfer to Pendleton for losing his Corizon lawsuit because it was harder to access the law library at Pendleton. *Id.* at 63, 84. He testified that, if not on deadline status, inmates were only allowed to go to the law library for one hour a week, and that visit was often cancelled and not rescheduled if the facility was on lockdown.[4] *Id.* at 84−85. At Wabash Valley, he went to the law library four hours a week. *Id.* at 85. Further, because he was the "new guy," he could not get any

---

[4] A law library pass shows that between December 17, 2018, and January 24, 2019, Mr. Wells was scheduled to go to the law library at Pendleton 15 times and was able to go 11 times. Dkt. 71-9. Mr. Wells agreed that the pass was accurate and that he missed some of the visits due to having medical appointments scheduled at the same time. Dkt. 71-2 at 85−86.

help from other inmates at the Pendleton law library for the first eight or nine months he was there. *Id.* at 87−88. Additionally, he lost his job and some of his personal property during the transfer. *Id.* at 63−64.

### C. Delay in Receiving Property at Pendleton

Upon his arrival to Pendleton, Mr. Wells was placed on "A & O"—an admissions and orientation range. *Id.* at 64. He was there for almost two months and did not have access to his property. *Id.* Because Mr. Wells was in a cell "by [himself] with nothing but concrete and bars," he wanted his Bible so he could "try to decompress." *Id.* at 77. He wrote to Mr. Reagle and Warden Zatecky asking for both his Bible and his legal work. *Id.* They advised him to contact his counselor, Mr. Ross. *Id.* at 77, 82−83. Mr. Wells contacted Mr. Ross but received no response. *Id.*

Mr. Wells wrote to the chaplain several times, but he received no response and is not sure the chaplain ever saw his requests. *Id.* at 80. He asked a correctional officer on the A & O range for a Bible, but the officer replied that it wasn't his job to get him one. *Id.* He could not attend religious services while on the A & O range. *Id.* at 81. He would have attended only for the purpose of obtaining a Bible because he practices his faith through self-study rather than by attending services. *Id.* He was able to pray while on the A & O range. *Id.*

Mr. Wells believes Mr. Alsip, Mr. Reagle, and Warden Zatecky burdened his ability to practice Christianity because they did not tell Counselor Ross to provide Mr. Wells his Bible and ignored his written requests after he expressed concern that he hadn't received his Bible. *Id.* at 82−83. Mr. Wells attested that this problem may have been avoided if there was an improved mechanism for inmates on A & O to file request slips. *Id.* at 83 ("[T]here [should] be a secure way of filing request slips when you're in A & O so that you're not ignored, so they can't play that game

7

back and forth. It's his job, it's his job, it's not my job, it's your job.").

On December 19, 2018, Mr. Wells wrote a letter to IDOC Commissioner Bruce Lemmon, complaining that he had been without access to his legal work for the 24 days he had been at Pendleton. Dkt. 71-3. He stated that the delay violated an IDOC policy that provided that inmates should receive their property within 14 days of a transfer. *Id.* He said he needed the documents due to the Corizon lawsuit and his post-conviction case challenging his conviction. *Id.*

The State defendants submitted an inventory sheet that was signed by Mr. Wells on December 31, 2018, which stated, "I have reviewed this inventory and agree to its accuracy. I also realize that it is my responsibility to dispose of excess property or prohibited property in accordance with all facility procedures." Dkt. 71-4 at 1. Mr. Wells attested that although IDOC staff inventoried his property on December 31, he did not receive it until sometime after that date.[5] Dkt. 78 at 4, ¶ 6.

Michael Osburn, Executive Director of IDOC, responded to Mr. Wells' letter to Commissioner Lemmon on January 17, 2019. Dkt. 71-5 at 1. He wrote that Pendleton was experiencing a 30-day delay in processing property due to staff shortages at the facility. *Id.* He explained, "This increased delay is an effort to keep programs such as recreation and visiting going while the staff shortage persist[s]." *Id.* He also noted that inmates with court deadlines could request their legal work from case management staff, and a review of Mr. Wells records indicated he did not request his legal mail when he spoke to a case worker in A & O. *Id.* However, Mr. Wells attested that he requested his legal work from Mr. Ross and defendants Zatecky, Alsip, and Reagle

---

[5] The defendants respond that it would not make sense for Mr. Wells to sign an inventory sheet and not receive his property. Dkt. 81 at 3. Although Mr. Wells was unsure of the timeline of receiving his property—suggesting it was anywhere between 30 and 90 days after his arrival, dkt. 71-2 at 82—the inventory sheet demonstrates that he was without his property (including his Bible and legal work) for at least 34 days.

to no avail. Dkt. 78 at 4, ¶ 7.

A hearing in Mr. Wells' post-conviction case was postponed after his transfer to Pendleton, and that case remains pending. Dkt. 71-2 at 92. The post-conviction court advised Mr. Wells that he "could take as much time as [he] needed to try and build what [he] had at Wabash." *Id.* Because he is not prepared yet, he has not asked the judge to reschedule his hearing. *Id.*

Mr. Wells filed a motion for summary judgment in the Corizon case on April 9, 2019, and the defendants filed a cross motion for summary judgment on May 7. *See* dkts. 93, 99, *Wells v. Corizon Health*, cause number 2:18-cv-00124-JPH-DLP. Summary judgment was granted in the defendants' favor, and final judgment was entered on May 18, 2020. *Id.* at dkts. 113, 114.

### III.   DISCUSSION

Mr. Wells alleges that his transfer from Wabash Valley to Pendleton was retaliatory. He also alleges that the delay in receiving his Bible burdened his right to practice his religion.

**A. First Amendment Retaliation Claims**

Mr. Wells must establish three elements to prove a First Amendment retaliation claim. "First, he must show he engaged in protected First Amendment activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020). "Furthermore, "[c]onduct that does not independently violate the Constitution can form the basis for a retaliation claim, if that conduct is done with an improper, retaliatory motive.'" *Id.* (quoting *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005)).

9

Mr. Wells alleges that the defendants retaliated against him for filing his Corizon lawsuit.[6] The defendants do not dispute that filing a lawsuit is a protected activity. Thus, only the second and third elements are at issue.

    **i.    Adverse Action**

The second element—whether the transfer was an adverse action—is dispositive. "The standard for determining whether an action is sufficiently adverse to constitute retaliation is well established: it must be likely to deter a person of ordinary firmness from continuing to engage in protected activity." *Holleman*, 951 F.3d at 880 (cleaned up). The standard is objective and does not depend on the personal experience of the plaintiff. *Id.* Also, "the harsh realities of a prison environment affect [a court's] consideration of what actions are sufficiently adverse." *Id.*

*Holleman* is particularly instructive. IDOC inmate Robert Holleman alleged that his transfer from Pendleton to Wabash Valley was in retaliation for filing grievances and complaining about the conditions at Pendleton. Holleman alleged the following deprivations due to the transfer: (1) he witnessed more violence at Wabash Valley; (2) he had less access to the law library at Wabash Valley, going from seven hours per week to four hours per week; (3) he was housed with a cellmate instead of an individual cell; and (4) a transfer to another prison is adverse because it disrupts the prisoner's lifestyle, depriving "him of human connections, job stability, and a familiar environment." *Id.* at 877, 881.

The Court reviewed other cases that presented "serious changes of circumstance" that would constitute an adverse action—delaying a transfer to another facility out of a life-threatening housing

---

[6] The State defendants argue that Mr. Wells' retaliation claim is based on him filing his petition for post-conviction relief because 1) Mr. Wells refers to a 2016 case and 2) his post-conviction petition was the only case filed by Mr. Wells that year. But Mr. Wells' deposition testimony makes clear that his protected act was filing the 2018 civil rights lawsuit. Dk. 71-2 at 31, 35, 40−43, 61−62. That Mr. Wells guessed that he filed his civil rights suit in 2016 does not create a dispute of material fact. *See id.* at 41 (Mr. Wells testifying he believed the Corizon lawsuit was filed in 2016).

situation; a transfer from general population into a segregated housing unit; and a transfer from a minimum-security prison to a maximum-security prison. *Id.* at 881 (internal citations omitted). It then concluded that Holleman's transfer from the general population of one maximum-security prison to another did not constitute an adverse action:

> The Defendants did not transfer him into, or delay transferring him out of, a life-threatening situation. Holleman alleges no increase in restrictions imposed on him at Wabash Valley, other than minor differences in the policies and conditions of the facilities. The changes in circumstances he does allege—less library time, being made to share a cell, and having to witness more violence—do not transform the transfer into an adverse action because there is no evidence the Defendants knew the transfer would result in these incidental changed conditions.

*Id.* at 881. The court also rejected Holleman's claim about the disruption of a transfer from a familiar setting to an unfamiliar one, noting again that "prisoners are subjected to harsher conditions and environments than ordinary citizens. No prison is an ideal home, and it is unlikely to be a home of anyone's choice." *Id.* at 881−82. The court concluded,

> Thus, the disruption inherent in a transfer to a different facility does not by itself make the transfer adverse. *Without some additional aggravating factor, such as relocation to a much more restrictive or dangerous environment*, a transfer is not likely to deter a person of ordinary firmness from continuing to engage in protected conduct.

*Id.* at 882 (emphasis added).

Mr. Wells' situation is nearly identical to Holleman's, though their "home" prisons switched. Like Holleman, Mr. Wells alleged that reduced law library time and the loss of his job were adverse consequences of his transfer. He also lamented the difficulty being "the new guy" when seeking help in the law library. But Mr. Wells produced no evidence that the defendants were aware that he would have less access to the law library or a temporary deprivation of his legal materials on account of a staff shortage at Pendleton. Further, although Mr. Wells alleges that the transfer was intended to "sabotage" his Corizon lawsuit, he was able to attend the law library 11 times over the course of

11

five weeks and file motions and pleadings in that case. Dkt. 71-9; *Wells v. Corizon Health*, cause number 2:18-cv-00124-JPH-DLP (showing that post-transfer, between December 11, 2018 through July 3, 2019, when summary judgment briefing was completed, Mr. Wells filed over twenty notices, motions, responses, etc.).

Critically, Mr. Wells was not moved to a more restrictive or dangerous setting. Indeed, as *Holleman* demonstrates, the differences between Pendleton and Wabash Valley are in the eye of the beholder, and the Seventh Circuit explicitly rejected the argument that a transfer from one's "home" facility to another similar facility could on its own be considered an adverse action. *Holleman*, 951 F.3d at 882.

Additionally, Mr. Wells was transferred to Pendleton so he could receive regular physical therapy. He did, and his back improved. Dkt. 71-2 at 50−51. "A transfer that objectively improves the prisoner's condition . . . would not deter a person of ordinary firmness from engaging in protected activity." *Holleman*, 951 F.3d at 881.

Accordingly, no reasonable juror could conclude that Mr. Wells' transfer to a different maximum-security prison would deter an ordinary prisoner from engaging in protected conduct.

    **ii.**    **Retaliatory Motive**

Mr. Wells' retaliation claims also fail on the causation element. "[A] transfer initiated to punish a prisoner for engaging in protected activity would satisfy the causation element of retaliation, but a transfer initiated as a rational, justifiable response to the substance of the prisoner's complaint would not." *Holleman*, 951 F.3d at 880. There was no doubt a connection between the substance of the Corizon lawsuit and Mr. Wells' transfer to another facility. The Corizon lawsuit was about whether he was being provided adequate care for his lower back pain.

12

Dr. Byrd recommended the transfer to another facility because he felt that physical therapy would be the most effective course of treatment for Mr. Wells' persistent pain, and Wabash Valley did not have an onsite physical therapist in 2018.[7] Dkt. 69-4 at ¶ 6. Upon learning that Mr. Wells didn't want to be transferred, Dr. Byrd twice alerted IDOC officials of the same. Dkt. 69-2 at 4, 7. Dr. Mitcheff advised Dr. Byrd to have Mr. Wells sign a consent form stating he did not want physical therapy, but he did not press IDOC officials to continue with the transfer.[8] *Id.* at 6.

Ultimately, IDOC officials decided to proceed with the transfer. Dkt. 69-2 at 4. At that time, there was a pending motion for a preliminary injunction in his Corizon case seeking an MRI and a referral to an offsite specialist for a treatment plan. *See* dkt. 34, "Plaintiff's Motion for Emergency Medical Inju[n]ction," (filed Oct. 19, 2018), *Wells v. Corizon Health*, cause number 2:18-cv-00124-JPH-DLP. Thus, the decision to transfer Mr. Wells to a facility with onsite physical therapy to provide immediate care was a justifiable response to the issue within the lawsuit, not a punishment. *Holleman*, 951 F.3d at 880 (noting courts owe significant deference to prison officials' non-retaliatory justification for transfer).

Because Mr. Wells has failed to prove both the second and third elements of a retaliation claim, summary judgment must be granted in favor of defendants Dr. Byrd, Dr. Mitcheff, Ms. Hobson, Mr. Hendrix, Warden Brown, and Warden Zatecky.

---

[7] That inmate Ivy saw a physical therapist at Wabash Valley in 2015 and Mr. Wells saw a physical therapist provide therapy to another inmate at Wabash Valley does not contradict Dr. Mitcheff and Dr. Byrd's testimony that as of November 2018, there was no onsite physical therapist employed at Wabash Valley.

[8] With respect to HSA Hobson, the undisputed evidence shows she was not involved with Mr. Wells' transfer. Dkt. 69-5 at ¶ 11. Mr. Wells' allegation that she failed to refer him to a doctor in 2016 after he complained of ineffective treatment sounds in deliberate indifference, not retaliation. And the Court dismissed all Eighth Amendment claims in its screening order. Dkt. 15.

### iii. Policy Claim

Plaintiffs may sue municipalities (or private corporations acting under color of state law to perform government services) alleging that the defendant's unconstitutional policy, practice, or custom caused a constitutional injury. *Monell v. Dep't of Social Services*, 436 U.S. 658, 690−91 (1978). To prevail on a *Monell* claim, "a plaintiff must ultimately prove three elements: (1) an action pursuant to a municipal [or corporate] policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal [or corporate] action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020); *see Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (applying *Monell* theory of liability to private company acting under color of state law). Additionally, the failure to make a policy itself may be actionable conduct. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

Mr. Wells alleges that he suffered retaliation because Wexford and IDOC Commissioner Robert Carter failed to train their employees to recognize and prevent retaliatory transfers. But neither Wexford nor Commissioner Carter can "be liable under *Monell* when there is no underlying constitutional violation[.]" *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) (citing *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007)). Here, the Court has determined that Mr. Wells suffered no constitutional injury when he was transferred from one maximum-security facility to another to secure medical treatment. Accordingly, summary judgment must be granted in favor of Wexford and Mr. Carter for Mr. Wells' policy claim.

### B.   Free-Exercise Claims

"An inmate retains the right to exercise his religious beliefs in prison." *Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005). To survive summary judgment, Mr. Wells must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016).

Mr. Wells alleges that the delay in receiving his Bible burdened his ability to practice his Christian faith. While waiting to receive his Bible, he was still able to pray. Dkt. 71-2 at 81−82. But because he was living in the orientation range with limited access to services, he wanted access to his Bible so he could "try to decompress." *Id.* at 77.

"[A]n inmate is not entitled to follow every aspect of his religion; the prison may restrict the inmate's practices if its legitimate penological interests outweigh the prisoner's religious interests." *Kaufman*, 419 F.3d at 683. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Factors that are relevant to determine the validity of the regulation include:

> (1) whether, as applied here, the [prison's] policy was rationally connected to a legitimate governmental interest, (2) whether inmate [Wells] had an alternative means to vindicate his free exercise rights, (3) what the effect of accommodating [Wells'] rights would be on the guards and other inmates, and (4) whether there were ready alternatives to the [prison's] regulation.

*Tarpley v. Allen Co., Indiana*, 312 F.3d 895, 898 (7th Cir. 2002) (citing *Turner*, 428 U.S. at 89–91).

With respect to the first factor, the defendants have presented a legitimate governmental objective for the delayed delivery of Mr. Wells' personal Bible. Because of a staff shortage, there

15

was a 30-day delay in processing transferred property. Dkt. 71-5 at 1. Pendleton administrators decided to allocate its staff to maintain other programs such as recreation and visiting while the shortage continued. *Id.*

But the other factors favor Mr. Wells. The defendants argue that Mr. Wells had an alternative means to practice his religion because he could pray in his cell. But it is well-settled that "denying prisoners access to their holy text . . . is a substantial burden on free-exercise rights." *Garner v. Muenchow*, 715 F. App'x 533, 536 (7th Cir. 2017) (citing *Sutton v. Rasheed*, 323 F.3d 236, 253−57 (3d Cir. 2003) ("[W]hile we believe that a Christian inmate could practice his religion generally even if prevented from attending Christmas or Easter services, we do not believe he could practice his religion if deprived of access to the Bible.") and *Kay v. Bemis*, 500 F.3d 1214, 1229 (10th Cir. 2007)); *see also Blankenship v. Setzer*, 681 F. App'x 274, 277 (4th Cir. 2017) (holding 10-day deprivation of Bible during transport from state prison to county jail substantially burdened inmate's religion); *Tarpley*, 312 F.3d at 899 (observing that providing inmate a copy of the jail's Bible "offered him the essential material for his religious studies").

Looking at the third and fourth factors, accommodating Mr. Wells' religious rights would have been simple with little to no impact on the guards or inmates. If digging through Mr. Wells' property to find his Bible was too much trouble given the staff shortage, prison administrators could have provided him a Bible. *See Tarpley*, 312 F.3d at 898−99 (providing inmate with substitute Bible in place of his personal Bible was an appropriate alternative). The defendants told Mr. Wells that he could obtain his Bible from his counselor, but they failed to follow up when efforts to get the Bible from the counselor failed. *See Garner*, 715 F. App'x at 535−37 (where Muslim inmate was sent on a "wild goose chase" to obtain a Quran by being forced to ask multiple staff members for a catalog, jury could reasonably find an intent to prevent his religious practice).

Because a reasonable juror could conclude that Warden Zatecky, Mr. Alsip, and Mr. Reagle placed a substantial burden on the exercise of Mr. Wells' religion by depriving him of a Bible for at least a month, summary judgment must be **denied** as to this claim.

### IV.   CONCLUSION

For the foregoing reasons, the Medical Defendants' motion for summary judgment, dkt. [67], is **granted**. The State Defendants' motion for summary judgment, dkt. [71], is **granted in part and denied in part**. It is **granted** as to the First Amendment retaliation and policy claims and **denied** as to the First Amendment free exercise claims.

The **clerk is directed to terminate** the following defendants from the docket: Jack Hendrix; Commissioner, Indiana Department of Corrections; Dick Brown; Dr. Samuel J. Byrd; Wexford of Indiana, LLC; Dr. Mitcheff; and Kim Hobson.

Mr. Wells' free exercise claims against Warden Zatecky, Mr. Alsip, and Mr. Reagle will be resolved by settlement or trial. The Court sua sponte reconsiders its denial of Mr. Wells' motion for assistance with recruiting counsel, dkt. [10], and will attempt to recruit counsel to represent him through final judgment.

No partial final summary judgment shall issue.

**IT IS SO ORDERED.**

Date: 1/3/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

ANDRE C.T. WELLS
196966
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel